# United States Court of Federal Claims

No. 07-714 C
Filed November 14, 2007
Reissued November 29, 2007[*]
TO BE PUBLISHED

|  |  |  |
|---|---|---|
| MASAI TECHNOLOGIES CORP., | ) | Post-award bid protest; |
|  | ) | jurisdiction; Tucker Act, 28 |
| Plaintiff, | ) | U.S.C. § 1491(b); |
|  | ) | Administrative Procedure Act, 5 |
|  | ) | U.S.C. § 706; arbitrary, |
|  | ) | capricious, abuse of discretion, |
|  | ) | or otherwise not in accordance |
|  | ) | with law; rational basis; |
|  | ) | violation of regulation or |
| v. | ) | procedure; organizational |
|  | ) | conflicts of interest; unequal |
|  | ) | access to information creating an |
|  | ) | unfair competitive advantage; |
|  | ) | application of evaluation criteria |
| THE UNITED STATES, | ) | set forth in RFQ; request for |
|  | ) | clarification; interpretation of |
| Defendant. | ) | RFQ; question of law; *de novo* |
|  | ) | review; price reasonableness; |
|  | ) | late proposal modification; |
|  | ) | substitution of personnel |

James DelSordo, Argus Legal, LLC, Manassas, Virginia, for plaintiff.  Janine Benton, Kathy Potter, Benton & Potter, Falls Church, Virginia, of counsel.

Courtney E. Sheehan, Trial Attorney, Patricia McCarthy, Assistant Director, Jeanne E. Davidson, Director, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.  Major Christinalynn E. McCoy, U.S. Army Legal

---

[*] This Opinion and Order was originally filed under seal on November 14, 2007, pursuant to the protective order entered in this action on October 11, 2007.  The parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be redacted under the terms of the protective order.  The parties filed a joint status report (docket entry 37) on November 28, 2007, proposing certain redactions, which the Court has adopted.  Accordingly, the Court is reissuing its Opinion and Order dated November 14, 2007, with the agreed redactions indicated by three consecutive asterisks within brackets.

Services Agency, Arlington, Virginia, Dorothy M. Guy, U.S. Army Medical Research and Materiel Command Office of the Staff Judge Advocate, Fort Detrick, Maryland, of counsel.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

This post-award bid protest action is before the Court on plaintiff's motion for judgment on the administrative record[1] and for preliminary injunction ("Pl.'s Mot.," docket entry 19), plaintiff's statement of facts (docket entry 15), defendant's motion for judgment on the administrative record ("Def.'s Mot.," docket entry 16), all filed October 19, 2007.  Plaintiff filed its opposition to defendant's motion and reply in support of plaintiff's motion ("Pl.'s Opp.," docket entry 26) on October 29, 2007.  Defendant also filed its response to plaintiff's motion for judgment on the administrative record and counter-statement of facts ("Def.'s Response," docket entry 27) on October 29, 2007.  The Court held a hearing on the motions on November 2, 2007.  At that hearing, plaintiff's second motion to supplement the administrative record was granted (docket entries 24 and 25).  Subsequent to the hearing, defendant's motion to supplement the administrative record was also granted (docket entry 33).

For the reasons set forth below, the motion of plaintiff Masai Technologies Corp. ("MTC") for judgment on the administrative record is **DENIED**, and the motion of defendant for judgment on the administrative record is **GRANTED**.

## *BACKGROUND*

### I.    The RFQ and its Amendments

On August 3, 2006, the U.S. Army Medical Research Acquisition Activity ("USAMRAA")[2] at Fort Detrick, Maryland, issued Request for Quotation ("RFQ") W81XWH-06-T-0285, a HubZone Small Business set aside to procure commercially available computer and technical support for the Army's new medical logistics information system, the Theater Wide

---

[1] *See* Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"); *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (describing former RCFC 56.1, predecessor of the present RCFC 52.1, as "a rule designed to provide for a trial on a paper record, allowing for fact-finding by the trial court").

[2] USAMRAA is the contracting element of the U.S. Army Medical Research and Materiel Command (USAMRMC) and provides support to the Command's headquarters at Fort Detrick and to its worldwide network of laboratories and medical logistics organizations, including the acquisition of medical equipment.  *See generally* the parties' Joint Glossary of Acronyms (docket entry 28) filed at the Court's request on October 29, 2007.

Enterprise Logistics System ("TEWLS").  Administrative Record ("AR") 28.  The RFQ
describes TEWLS, a multi-phased development effort, as follows:

> The TEWLS system is the newly developed medical logistics information system
> for the Army Medical Department.  The development of TEWLS is a combination
> of several U.S. Army Medical Research and Materiel Command (USMRMC)
> efforts re-hosting the Theater Army Medical Management Information System
> Medical Supply (TAMMIS MEDSUP) intermediate level supply system
> capabilities into the U.S. Army Medical Material Agency's USAMMA
> Revolution in Logistics (URL).  TAMMIS MEDSUP is a legacy application
> supporting unit and retail medical logistics requirements used by fixed medical
> treatment facilities and deployable medical forces.  TAMMIS MEDSUP currently
> operates in Division Medical Supply Offices, Combat Support Hospitals, Medical
> Logistics Companies, Medical Logistics Support Companies, and Theater
> Distribution Centers currently located in CONUS, Korea, Iraq, Qatar, and
> Germany.  The TEWLS solution allows for a new division of business processes
> at the national, regional, and local levels of operation (for example customer
> vendor, catalog and inventory management functions should occur at the national
> and regional level while physical storage and distribution processes occur at the
> local level).  Re-hosting of TAMMIS intermediate level Class VIII capabilities
> into Enterprise Resource Planning (ERP) solution using System Application
> Products (SAP) software, building from the existing USAMMA Revolution in
> Logistics (URL) ERP information system will enable organizations to continue
> supporting medical mission support requirements to the war-fighter.

AR 35-36.  The RFQ addressed sustainment support[3] for Release 1 of TEWLS[4] and contemplated
the award of a firm-fixed-price contract for a one-year base period and two one-year option
periods.  AR 31-34.

---

[3] Sustainment work is related to operations and maintenance support of a system, and is
contrasted with development work.  *See* Letter from United States Department of the Interior to
GAO, April 23, 2007, p. 1, n. 2 (docket entry 24-2).

[4] The Solicitation describes TEWLS Release 1 as "provid[ing] data harmonization and
synchronization of purchasing/materiel data elements inside USAMMA, USAMMCE, 6th
MLMC, DSCP, and CENTCOM units, (i.e. medical distribution units, Combat Support
Hospitals, and Division Medical Supply Operations) and linking it with USAMMA's Business
Intelligence/Business Warehouse (BI/BW) using SAP Master Data Management (MDM) and
NetWeaver tools.  Release 1 also provides the ability to turn-off TAMMIS capabilities at the 6th
MLMC by reconfiguring the existing SAP System URL in order to [add certain functionalities]."
AR 36.

The RFQ was for a "best value" procurement and stated that each proposal[5] received would be evaluated on four factors: personnel qualifications, technical approach, past performance, and price.  AR 50.  Technical approach was further broken down into the following sub factors, listed in descending order of importance: management approach, planning, capability, and quality control plan.  *Id*.  The RFQ provided that "Personnel Qualifications is significantly more important than Technical Approach," that "Technical approach, with all the sub factors combined, is slightly more important than Past Performance," and that "[t]hese three non-cost factors, when combined, are more important than price."  AR 50.

Relative to this bid protest, and to the required qualifications of the proposed personnel, the RFQ provided:

> **1.4.0   Security**.  The contractor will take necessary steps to ensure the following security clearances are met.  At a minimum, all contractor employees must possess approved National Agency Check with Inquiries (NACI) and be a US citizen to gain access to U.S. Government computer systems.

AR 39.  Furthermore, in the RFQ's description of evaluation criteria, under Personnel Qualifications, the solicitation provided that "[p]roposed personnel must be immediately available no more than two business days from contract award[6] . . .[p]ersonnel cannot be substituted or replaced without the written agreement of the Contracting Officer."  AR 50.  This same section also provided that "[t]he proposal must be definitive enough to provide the government a clear understanding of how the Offeror intends to staff this task order to meet all requirements."  *Id*.

---

[5]  The terms proposal, offer (offeror) or quote (quoter) are used synonymously throughout the RFQ.  These terms are also used synonymously throughout this Opinion and Order, though in a commercial RFQ, the correct terms are quote and quoter.

[6]  In response to a question, the time frame was clarified as part of Amendment 0001: "[t]he government desires to begin performance at the earliest, two business days after contract award.  However, seven business days from contract award is the required availability date.  We may entertain partial contractor availability but would prefer that all proposed employees start the same day within the 2-7 day window established, however this is negotiable."  AR 63.

This RFQ was amended on various occasions[7] and has been the subject of three protests before the Government Accountability Office ("GAO") during the acquisition process. On August 24, 2006, quotes were received from three offerors, including Masai Technologies Corporation ("MTC") and Denysys Corporation ("Denysys"). Denysys was awarded the contract, and on September 27, 2006, MTC filed the first of its three protests at GAO. MTC's initial protest alleged the existence of an organizational conflict of interest ("OCI") based on the participation of BearingPoint ("BP") as a subcontractor to Denysys. In response to the protest, the Army took corrective action and issued Amendment 0002, requiring contractors to complete an OCI certification, which was due November 14, 2006. Based on the certifications and an independent investigation, the contracting officer determined that no OCI existed, and documented his findings. AR 68-138.

On February 1, 2007, the contracting officer again awarded the contract to Denysys, and MTC brought a second protest at the GAO, alleging that the award was not made in accordance with the stated evaluation factors and that the Army failed to identify and mitigate an impermissible OCI with BP.[8] In response to the protest, the Army again took corrective action. AR 11. Amendment 0003, issued on March 14, 2007, re-established the RFQ, clarified the travel requirement of the PWS, and established a new closing date of March 16, 2007 for receipt of revised proposals. AR 139. Amendment 0004 extended the closing date to March 20, 2007. On that date two proposals were received: a revised proposal by MTC and the previously submitted proposal by Denysys.

The Source Selection Evaluation Board ("SSEB"), serving in its advisory capacity in the evaluation process, asked the contracting officer to seek clarification from the offerors with regard to the citizenship of proposed employees, and on March 23, 2007, the contracting officer sent a request for clarification to both Denysys and MTC. The request stated:

---

[7]Amendment 0001, issued on August 16, 2006, included responses to questions submitted by interested contractors and changed the due date for quotes to August 24, 2006. AR 59. Amendment 0002, issued on October 30, 2006, required contractors to submit a Contractor Organization Conflict of Interest Certification. AR 65. Amendment 0003, issued on March 14, 2007, provided that the Army would insert its own estimate of $75,000 for the travel CLIN for evaluation purposes, and changed Paragraph 3.0 of the Performance Work Statement ("PWS") to indicate that the Army would perform a price reasonableness evaluation, in lieu of a price realism evaluation, consistent with the evaluation of firm-fixed-price offers. AR 139. Amendment 0004, issued on March 15, 2007, allowed for submission of revised quotes and extended the due date to March 20, 2007. AR 141. Amendment 0005, issued on March 19, 2007, clarified the answer to a question addressed in Amendment 0001. AR 287.

[8] It was not until MTC's third bid protest brought before GAO, see page 9, *infra*, that MTC learned that CompQSoft was also a member of Denysys's proposed team and relied upon that relationship as an additional basis for asserting the existence of an OCI. AR 823.

This is a request for clarification and not negotiations.  Paragraph 1.4.0 Security of the PWS requires all employees to have U.S. citizenship and must possess a National Agency Check with Inquiries (NACI).  Please confirm that all proposed employees are U.S. citizens and have an NACI.

AR 573.

Denysys responded by email on March 23, 2007, stating that "[a]ll employees we propose by Denysys and our subs are U.S. citizens and have recent valid NACI."  AR 575.  MTC also responded by email.  Though MTC stated in its response that it would "respond to [the contracting officer's] questions and . . . use this email to declare staff member substitutions," MTC's email response neither confirmed that all proposed employees were U.S. citizens nor stated that any proposed employees were not U.S. citizens.  AR 576.  On March 29, 2007, MTC telephoned the contracting officer regarding its clarification.  MTC states that the contracting officer "accepted" MTC's personnel substitutions during the phone conversation.  Pl.'s Complaint 8.  Defendant concedes that there was an oral communication about MTC's proposed personnel substitutions, but states that the contracting officer merely acknowledged receipt of MTC's email listing the proposed substitute personnel.  AR 3.  Neither party asserts that their verbal exchange was memorialized in writing.  Based on MTC's email response to the request for clarification, the contracting officer concluded that the four substitute personnel were proposed to be replacements for individuals who were not U.S. citizens.  AR 3.  The contracting officer determined that the proposed personnel substitutions constituted an untimely post-proposal revision that was not required to be and was not accepted.  AR 3.  Accordingly, the contracting officer did not provide MTC's email that listed proposed personnel substitutions to the SSEB.  AR 3, 610.

## II.    Evaluation of Proposals

The Army evaluated the proposals it received on March 20, 2007 from MTC and Denysys.  In evaluating the proposals with reference to the four factors (personnel qualifications, technical approach, past performance, and price), the Army used an adjectival rating system with the following color code: Blue = Excellent; Green = Good; Yellow = Satisfactory; Pink = Poor; and Red = Unsatisfactory.  For past performance, there was also a rating of White corresponding to Unknown Risk.  Within each shade, other than Red and White, the degree of risk to the Government was assessed using the shade of the color: Dark (low risk), Medium (moderate risk) or Light (highest risk).  AR 15.  The RFQ required that the proposal receive at least a satisfactory rating in all non-price factors and subfactors in order to be eligible for award.  AR 52.

Both the SSEB, comprised of four members, and the Source Selection Authority ("SSA"), who in this procurement was the contracting officer, evaluated the quotes to determine which represented the "best value" to the Army.  The role of the SSEB was to perform an in-depth evaluation of the proposals and provide the SSA with information to make an informed and reasoned award decision.  AR 725.  To this end, the SSEB discussed the strengths, weaknesses,

deficiencies, and uncertainties of each proposal, and formulated consensus ratings for each factor.  The SSEB also evaluated the reasonableness of the cost and staffing proposals of the two offerors.  AR 730.  The SSEB provided its consensus ratings and a written recommendation for award to the SSA, who in turn performed his own evaluation and documented the basis for his award decision.  AR 733.

Following is a summary of the evaluated prices and ratings for the two proposals upon which the SSA based his award decision.

Table 1
Offerors' Prices and Ratings as Evaluated by the SSA

|  | **MTC** | **Denysys** |
|---|---|---|
| Proposed Price | [***] | [***] |
| Consensus Personnel Qualifications Rating | Unsatisfactory / Red | Exceptional / Medium Blue |
| Consensus Technical Approach Rating | Good / Medium Green | Exceptional / Medium Blue |
| Consensus Past Performance Rating | Satisfactory / Dark Yellow | Excellent / Medium Blue |
| Overall Rating | Unsatisfactory / Red | Excellent / Medium Blue |

### A.    Personnel Qualifications

Denysys received a consensus rating from the SSEB of Excellent / Medium Blue for its Personnel Qualifications based on it being "superbly qualified with an outstanding understanding of the services needed" and staff that "demonstrated excellent experience in every facet of services required by the solicitation."  AR 735.  In its consensus evaluation, the SSEB attributed a deficiency to MTC under Personnel Qualifications because "[f]our of the personnel proposed for work under this contract are non-US citizens" and "[t]he PWS specifically states that US citizenship is required."  AR 727.   Therefore, while the Army found that MTC proposed "a strong Project Manager and well-qualified staff," MTC's proposal was ultimately evaluated by the SSA as being Unsatisfactory / Red because of "the fact that four proposed personnel were not U.S. citizens."  AR 735.

### B.    Technical Approach

For the Technical Approach factor, Denysys received a consensus rating of Excellent / Medium Blue, based on a finding that the "methodology and analytical techniques of the management approach, the planning segments, the expected deliverables, the Quality Control

Plan, etc., were all superior." AR 735. MTC received a consensus rating of Good / Medium Green, with the SSA agreeing with the SSEB's finding that "the technical approach satisfie[d] all requirements of the PWS and [was] well conceived" (AR 634), but also stating that "the approach was viewed as being overly complex." AR 735.

### C.    Past Performance

For Past Performance, Denysys received an Excellent / Medium Blue and MTC received a Satisfactory / Dark Yellow. In the Award Decision Memorandum, the SSA explained that "the relevancy and magnitude of [MTC's] presented past performance examples were suitable. However, MTC's primary past performance efforts were accomplished under the URL contract which offered only a partial scope of the TEWLS project." AR 735-36.

### D.    Price

After performing its technical evaluations, the SSEB reviewed the price proposals and advised the SSA as to whether the prices being charged were appropriate for the labor and mix of expertise being offered and if the prices were in line with national standards for SAP type consultants. AR 6. The SSEB stated that "[a]lthough the cost proposal for DENYSYS shows an annual increase of 3% as opposed to MTC showing an annual decrease of 3% the SSEB feels that the total package provided by DENYSYS outweighs the difference in cost over the possible three year life of the contract." AR 730.

In arriving at the evaluated base-year total prices, the SSA used the offerors' proposed labor prices (CLIN 0001) and Contractor Manpower Reporting price (CLIN 0003), and added the Government's anticipated travel estimate (CLIN 0002). AR 1013. In doing so, the SSA mistakenly used an anticipated travel estimate of $25,000 instead of the $75,000 stated in Amendment 0003. *Id.* However, the $25,000 travel estimate was utilized in calculating the base year total prices for both proposals. *Id.* As set forth below at pages 18-19, use of the erroneous estimate in both proposals did not affect the outcome of the Government's evaluation of the price factor. Table 2 summarizes the prices used by the SSA in evaluating the proposals.

Table 2
Evaluated Prices

|                  | MTC      | Denysys  |
| ---------------- | -------- | -------- |
| CLIN 0001 Labor  | [***]    | [***]    |
| CLIN 0003 CMR    | [***]    | [***]    |

|  | **MTC** | **Denysys** |
| --- | --- | --- |
| CLIN 002 Travel | $25,000.00 | $25,000.00[9] |
| **Base Year Total** | [***] | [***] |
| Option Year 1 Total | [***] | [***] |
| Option Year 2 Total | [***] | [***] |
| **Grand Total** | [***] | [***] |

AR 736, 1013.

Consistent with the foregoing evaluated pricing methodology, the SSA found that the Denysys proposal was 1.5 percent less costly than the MTC proposal for the base year, but that the MTC proposal was 7.12 percent less costly than that of Denysys over the potential three-year performance period. AR 737. The SSA also stated, with respect to MTC's proposal, that the "de-escalation of the price of professional services [in the option years] under a firm-fixed price contract is unusual and dubious." AR 732.

E.     Award Decision

The SSEB issued its Summary on April 19, 2007. AR 725. The SSA issued his Decision Memorandum on May 7, 2007 (AR 731) and the Award Decision Memorandum on May 18, 2007. AR 733. The SSA largely agreed with the SSEB's ratings and rationale, but made one correction to an error the SSEB made in rolling up the factor ratings into an overall rating. Specifically, the SSEB gave MTC a rating of "Unsatisfactory" for Personnel Qualifications, AR 621, but gave an overall rating for non-price factors of Poor / Dark Pink. AR 619. The SSA changed the overall adjectival rating for the MTC proposal to Unsatisfactory / Red in conformity with the RFQ provision pursuant to which a rating of unsatisfactory in any  non-price factor made the proposal unsatisfactory and ineligible for award. AR 731. The SSA concluded that even "[h]ad the MTC proposal received award consideration, the Denysys proposal clearly was technically superior," concluding that "Denysys provide[d] the best overall value to satisfy Army needs." AR 732. Contract W81XWH-07-P-0455 was awarded to Denysys on May 24, 2007. AR 794.

---

[9]  The original proposed price submitted by Denysys included $60,000 for travel expenses. This figure was adjusted to $25,000 (i.e., reduced by $35,000) for evaluation purposes based on Amendment 0003, which set forth the government estimate of travel costs and stated that the Government would not consider prices proposed by offerors for CLINs 0002, 0005, and 0008. AR 1039. MTC, which revised its proposal after the issuance of Amendment 0003, did not include a dollar amount for travel expenses. Thus the full $25,000 estimate of travel costs was utilized in evaluating MTC's proposal.

### III.   Post-Award Proceedings

On June 4, 2007, MTC filed a third post-award bid protest at the GAO, alleging that the Army improperly evaluated its proposal and failed to adequately consider an alleged OCI. AR 822. In this protest, MTC identified CompQSoft as a subcontractor implicating potential OCI issues, as well as BP. AR 823. GAO denied the protest on September 10, 2007. AR 1082. Specifically, the GAO found that the Army properly determined that MTC's proposed personnel substitutions constituted a late modification or revision to MTC's original proposal, and that the Army was not required to evaluate or accept MTC's revised proposal. AR 1087, *see* FAR § 52.215-1(c)(3)(ii)(A) and (B). The GAO also found that the SSA reasonably concluded that MTC's original personnel proposal failed to comply with the solicitation requirement that the individuals proposed to perform the contract be U.S. citizens with NACI security clearances. AR 1088. Finally, with respect to the OCI allegations, the GAO found that "the agency gave thorough and comprehensive consideration to the prior activities of Denysys and its subcontractors, as well as MTC and its subcontractors, in order to assess whether those activities created OCIs"; that "MTC [did] not identif[y] any material flaw in the agency's review"; and that there was no basis to question the Army's conclusions in this respect. AR 1090-91.

MTC filed the present bid protest action on October 4, 2007.

### *ANALYSIS*

### I.   Jurisdiction

Pursuant to the Tucker Act, 28 U.S.C. § 1491(b) (2000), the United States Court of Federal Claims has jurisdiction over post-award bid protest cases.[10] The Tucker Act grants the Court of Federal Claims "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The Tucker Act further permits the Court to "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." *Id.* § 1491(b)(2).

---

[10] Section 12 of the Administrative Dispute Resolution Act of 1996 ("ADRA") gave the Court of Federal Claims jurisdiction over bid protest cases. Pub. L. No. 104–320, 110 Stat. 3870, 3874–76 (1996). Although initially both the Court of Federal Claims and the district courts had concurrent jurisdiction over bid protests, under the ADRA the district courts' jurisdiction was to terminate on January 1, 2001, unless extended by Congress. ADRA § 12(d). Congress did not renew the bid protest jurisdiction of the district courts, so the Court of Federal Claims has become the exclusive judicial forum for bid protest cases.

## II.   <u>Standing</u>

In order for this Court to exercise its jurisdiction in a post-award bid protest case, ADRA requires the plaintiff to demonstrate that it is an "interested party." 28 U.S.C. § 1491(b)(1). The plaintiff's status as an "interested party" is an element of standing, a "threshold requirement in every federal action." *Sicom Sys. Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 975 (Fed. Cir. 2005). Although ADRA does not define "interested party," the Federal Circuit has held that the term should be given the same meaning in the ADRA context as it has in the Competition in Contracting Act: "an actual . . . bidder . . . whose direct economic interest would be affected by the award of the contract or failure to award the contract." *American Fed'n of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (*quoting* 31 U.S.C. § 3551(2)(A)). Additionally, "prejudice (or injury) is a necessary element of standing." *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002). To meet this criterion, the plaintiff must allege "that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (*quoting Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)). Thus, to demonstrate standing in this case, MTC was required to allege both that it was an actual bidder and that it had a substantial likelihood of receiving the contract award in the absence of the Army's alleged errors.

MTC was an "actual bidder," in that it submitted a timely proposal in response to RFQ W81XWH-06-T-0285. Therefore, to determine whether MTC has shown sufficient potential prejudice to have standing, this Court must decide whether, assuming all of MTC's allegations regarding the Army's errors in evaluating bids are true, there is a substantial likelihood that MTC would have been awarded the contract.

MTC alleges three errors in the Army's actions in conducting this procurement. First, MTC argues that the technical evaluation was flawed because "the contracting officer failed to evaluate MTC's personnel and refused to provide MTC's clarified proposal in response to the contracting officer's request for clarification." Pl.'s Opp. 1. Second, MTC argues that "the contracting officer improperly conducted an unwarranted price realism analysis of MTC's proposal." *Id*. Finally, MTC argues that the contracting officer "ignored a real and unmitigated [OCI] inherent in the award to Denysys Corp. ('Denysys') and its two subcontractors [BP] and CompQSoft (the 'Subcontractors')." *Id*. Were MTC's allegations proven, a proper evaluation might well have resulted in the Army's awarding the contract to MTC. Furthermore, were MTC's allegations regarding an impermissible and unmitigated OCI sustained, Denysys, the only other offeror, would be ineligible for award. 48 C.F.R. § 9.504(e). Thus, assuming MTC's allegations were sustained, there is a substantial likelihood that, but for the Army's alleged errors, MTC would have been awarded the contract, and MTC therefore has standing to pursue its claim in this court.

### III.    <u>Standard of Review</u>

Pursuant to the Tucker Act, this Court reviews the challenged agency action under the Administrative Procedure Act ("APA") standards set forth in 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4); *see also Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) . . . ."). Under the APA standards, an agency action will be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or if it is "without observance of procedure required by law."  *Id.* § 706(2)(D).  In other words, "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

"The arbitrary and capricious standard . . . is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."  *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  If an award is challenged on the ground that the procurement official's decision lacked a rational basis, the Court must determine whether the agency provided a "coherent and reasonable explanation of its exercise of discretion,"  *Impresa Construzioni*, 238 F.3d at 1333 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)), and plaintiff "bears the 'heavy burden' of demonstrating that the award 'had no rational basis.'"  *Id.* (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)).  In making its determination, the Court "is not empowered to substitute its judgment for that of the agency."  *Emerald Coast Finest Produce Co., Inc. v. United States*, 75 Fed. Cl. 549, 554 (2007) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

Where the plaintiff challenges the award on the ground that it was in violation of regulation or procedure, plaintiff must show a "clear and prejudicial violation of applicable statutes or regulations."  *Id.* (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).  This inquiry does not proceed by reference to the deferential standard applied when determining whether the procurement official's decision lacked a rational basis.  The agency's action was either lawful or not.  If the action was prejudicially unlawful, it does not matter that the agency's perception that its conduct was lawful is reasonable.  *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 791 (1997).  Thus, when the court is determining whether the agency's actions were "otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A), the standard of review is *de novo*.

In determining whether the agency decision was arbitrary or capricious, the Court evaluates four factors: whether "(1) there was subjective bad faith on the part of the procuring officials; (2) there was a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; and (4) pertinent statutes or regulations were violated."  *United Int'l Investigative Servs. v. United States,* 41 Fed. Cl. 312, 318 (1998) (citing *Keco Indus., Inc. v.*

*United States*, 203 Ct. Cl. 566, 574, 492 F.2d 1200, 1203 (1974)).  There is, however, no "requirement or implication . . . that each of the factors must be present in order to establish arbitrary and capricious action by the government."  *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed. Cir. 1988).

In order to overturn the agency decision, it is insufficient for MTC to establish that the Army's action lacked a rational basis or violated a regulation or procedure.  To prevail, MTC also bears the burden of showing "a significant, prejudicial error in the procurement process." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999).  In order to show it was significantly prejudiced, MTC does not have to show that, but for the error, it would have been awarded the contract.  *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed. Cir. 1996).  Rather, "[t]o establish 'significant prejudice' [plaintiff] must show that there was a 'substantial chance' it would have received the contract award" absent the challenged agency action.  *Bannum*, 404 F.3d at 1353 (citing *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).  If MTC demonstrates that the contracting officer's rationale for declining to award to MTC was without a rational basis or otherwise not in accordance with law and that MTC was prejudiced as a result of the decision, "the contracting officer's decision will not stand."  *Hawaiian Dredging Constr. Co. v. United States*, 59 Fed. Cl. 305, 316 (2004).

## IV.    Discussion

### A.    The Army Properly Evaluated MTC's Technical Proposal

As noted earlier,  MTC asserts that the Army's evaluation of its technical proposal was unfair, unreasonable and improper.  MTC primarily argues that the Army violated the terms of the RFQ and applied unstated evaluation criteria when it determined that MTC's proposal failed to meet a material requirement of the solicitation, namely, that the offerors' proposed personnel be U.S. citizens.  Pl.'s Mot. 32-33.

The Government argues that "the solicitation unambiguously mandated that a bid include only employees who could be confirmed as United States citizens with a NACI, no later than two days following the contract award."  Def.'s Mot. 10.  The Government bases its interpretation on the interplay of several RFQ provisions.  In the provision entitled "Security," the RFQ stated that "[a]t a minimum, all contractor employees must possess approved National Agency Check with Inquiries (NACI) and be a US citizen to gain access to U.S. Government systems."  AR 39.  Second, the RFQ provided that that "[p]roposed personnel must be immediately available no more than two business days from contract award."  AR 50.[11]  Finally, the Government states that the RFQ "further advised potential quoters that they could not substitute or replace their

---

[11] As stated earlier in the Court's recitation of the factual background,  the required availability date was clarified in response to a question as part of Amendment 0001.  In its response, the Army relaxed its required availability to a two-to-seven-day window from contract award.  AR 63.

proposed personnel without written consent of the contracting officer." Def.'s Mot. 10.  The Government concluded that because MTC could not confirm that four of its initial eight proposed personnel were United States citizens at the time it submitted its proposal, "MTC could not guarantee them to have citizenship within two days of a contract award . . . [and therefore] there can be no question that MTC's original submission violated the solicitation requirements." *Id*. at 11.[12]

> 1.   The Army Properly Evaluated MTC's Proposal against the RFQ's Stated
>       Evaluation Criteria

The principal issue is whether the Army's interpretation, that the RFQ required that all proposed employees be United States citizens with a NACI, no later than two to seven days following the contract award, was correct.  MTC characterizes the Government's argument to be that it required all proposed employees be U.S. citizens at the time of proposal submissions.  Pl's Mot. 13.  In the Court's view, the Government's argument is more nuanced; that is, that the RFQ required employees who could be confirmed as United States citizens with a NACI, no later than two to seven days following the contract award, and that this security provision imposed a burden on offerors to demonstrate in their proposals an ability to fulfill this requirement with respect to all proposed employees.[13]

In evaluating the Army's interpretation, the Court does not inquire as to whether that interpretation was reasonable; rather, the Court construes the terms of the RFQ *de novo*.  "It is well settled that the task of construing the terms of a government solicitation essentially involves contract interpretation, and therefore presents issues of law to be determined by the court.  Indeed, the principles governing contract interpretation apply with equal force to the interpretation of government issued solicitations."  *Rotech Healthcare, Inc. v. United States*, 71 Fed. Cl. 393, 424 (2006) (citations omitted).  Furthermore, in interpreting the RFQ, the document should be construed in such a way as to best give meaning to all of its provisions, so that no

---

[12] The contracting officer interpreted MTC's response to the request for clarification, proposing substitute personnel, as a statement that four of the originally proposed individuals were not U.S. citizens.  Plaintiff now concedes that was the reason for the proposed substitutions.  Pl.'s Mot. 33-34 ("In responding to the Government [with respect to the request for clarification of proposed personnel's citizenship status], MTC recognized that based on the contracting officer's interpretation of the solicitation several of its personnel would not be available to perform the contract because of their lack of citizenship status.  MTC therefore proposed new personnel to replace the unavailable personnel.").  Thus, there is no question that the contracting officer's interpretation of MTC's response to his request for clarification was correct.

[13] At oral argument, the Government confirmed that had the MTC proposal indicated that the originally proposed personnel, though not U.S.-citizens, would be citizens within the required time-frame, and had this assertion been substantiated in some manner, MTC's original proposal would have met the requirement of the security provision.

provision is rendered superfluous.  *First Nationwide Bank v. United States*, 431 F.3d 1342, 1347 (Fed. Cir. 2005); *Hol-Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384, 395, 351 F.2d 972, 979 (1965).

The Court finds that the RFQ required that personnel be United States citizens with a NACI for security purposes.  Furthermore, the RFQ set forth a brief time-period post-award within which the security requirements had to be met.  Because the RFQ stated that "[t]he proposal must be definitive enough to provide the government a clear understanding of how the Offeror intends to staff this task order to meet all requirements" (AR 50),  the onus was on the offeror to demonstrate its ability to meet the security requirements within a period of two to seven days after award.[14]  The request for clarification regarding U.S. citizenship did not constitute a modification of the RFQ requirements, but was rather an attempt by the Army to gather the requisite information to determine if the RFQ requirements were met, in light of the inadequate information received.[15]

MTC argues in the alternative that if citizenship status was a material requirement of the RFQ, "the failure of the SSEB to evaluate Denysys on this matter taints the entire evaluation." Pl.'s Opp. 7.  This argument ignores the fact that Denysys made the affirmative representation that all proposed employees were U.S. citizens.  AR 2.  It appears from the record that the reason this aspect of the Denysys proposal was not discussed in the various evaluation documents is that the SSEB and SSA both understood that Denysys, in its response to the request for clarification, had made clear that it met the requirement of the security provision.

MTC's correspondence with the Army suggests that MTC understood the requirement but believed it to be too stringent in light of what it claimed to be the actual practice at the facility.  *See* AR 576, Email Correspondence from MTC Integration (Troutman) to Contracting Officer (Denton), Subj: Request for Clarification w/ attachments, dated March 28, 2007 ("this security guideline of 'U.S. citizens' has a documented history of being 'relaxed' on Ft. Detrick . . . where Green Card /non-U.S. citizen contractors who possess NACIs are used.").  To the

---

[14] At oral argument, the Court asked plaintiff whether, if the proper interpretation of the language in the RFQ required the offeror to be able to affirm or demonstrate that within two to seven days after award, the proposed personnel will be U.S. citizens with the proper security clearance, MTC would meet the requirement.  The plaintiff stated that "we [MTC] have a problem if we have to live with that original proposal."  Transcript of Oral Argument on November 2, 2007 ("Tr.") 28-29.

[15] MTC implies in its briefs that it did not understand the clarification request.  *See*, *e.g*., Pl.'s Opp. 7 (referring to "the contracting officer's failure to insure that MTC understood the clarification request").  In the Court's view, the contracting officer's clarification request was clear, and the fact that MTC sought to replace its non-U.S. citizen personnel in response to the request indicates that it understood the contracting officer to be addressing MTC's compliance with the security requirement insofar as it required personnel to be U.S. citizens.

extent MTC believed that the citizenship requirement was too stringent or otherwise improper, MTC should have raised its objection with the Army prior to submitting its proposal. *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) (failure to challenge the terms of the solicitation prior to the close of the bidding process waives the plaintiff's ability to raise the same objection later in a bid protest in the Court of Federal Claims).

> 2.    The Government Properly Decided Not to Consider MTC's Late Proposal
>        Modification That Proposed Substitute Personnel

MTC argues that, if its initial proposal was defective, the Army was obligated to evaluate its proposal based on the individuals proposed as substitutes for the original personnel, a revision submitted eight days after the closing date for receipt of proposals. AR 1-2. MTC has not demonstrated that the Army's exercise of discretion in rejecting its late proposal revision was unreasonable. MTC has also failed to demonstrate that the Army was obligated, either under the provisions of the FAR or the RFQ, to evaluate the proposal based on the substitute personnel.

The RFQ incorporated FAR § 52.215-1(c)(3)(ii)(A), mandating that "[a]ny offer, modification, revision, or withdrawal of an offer received at the Government office designated in the solicitation after the exact time specified for receipt of offers is 'late' and will not be considered" except in limited circumstances. AR 47. While the RFQ also incorporated FAR 52.215-1(c)(3)(ii)(B), which provides that "a late modification of an otherwise successful offer, that makes its terms more favorable to the Government, will be considered at any time and may be accepted," *id.*, this language leaves the decision whether to accept "a late modification to an otherwise successful offer" squarely within the discretion of the contracting officer. Furthermore, because MTC's original proposal was deemed unacceptable, it would not constitute "an otherwise successful offer" within the meaning of the provision. *See Masai Technologies Corp.*, B-298880.3, B-298880.4, 2007, Sept. 10, 2007, WL 2983081, at *6, n.12 (Comp. Gen.) ("the SSA reasonably concluded that MTC's initial proposal was unacceptable; accordingly, MTC's proposal was not 'an otherwise successful offer.'"); *see also Shuerman Development Co.*, B-238464, April 25, 1990, 90-1 CPD ¶ 423 (the late submissions clause allows Government to accept more favorable terms only from an offeror that would be in line to receive the contract, prior to submission of the late offer; it does not permit acceptance of a late modification from a firm not already in line for award). MTC has not offered any evidence that the contracting officer's rejection of MTC's revision as a late modification was arbitrary or capricious.

With respect to the RFQ provisions specifically addressing the substitution of personnel, the two relevant provisions either did not apply to pre-award substitutions, or MTC failed to comply with the express procedural requirements for such a substitution. Under the evaluation criteria section of the RFQ, in Section 2.1 Personnel Qualifications, the RFQ states that "Personnel cannot be substituted or replaced without the written agreement of the Contracting Officer." AR 50. In a separate section, the RFQ incorporates Army guidelines regarding replacement of "key personnel," which state that "during the contract performance period substitution of Key Personnel shall not be permitted unless such substitution is necessitated by

sudden illness, death, or termination of employment." AR 45.  As the Key Personnel clause, *id*., expressly applies to substitutions *during contract performance*, it does not apply to substitutions occurring prior to contract award.[16]  Furthermore, even if this clause did apply, and provide a basis upon which the contracting officer could have or should have accepted MTC's personnel substitutions, MTC at most argues that it received verbal "acceptance" of the revision, Pl.'s Complaint 8, while Section 2.1 requires written approval of the contracting officer.

The Court concludes that the administrative record reflects that the agency's action in declining to evaluate and accept MTC's untimely personnel substitutions was rational, reasonable, and consistent with both the terms of the RFQ and the FAR.

### B.    Evaluation of MTC's Price Proposal

MTC takes issue with various aspects of the price evaluation.  First, MTC argues that the Army failed to follow the evaluation criteria regarding the appropriate basis for proposed rates (local salary levels versus national standards).  Pl.'s Mot. 37.  MTC also argues that its prices "appear to have been adjusted upwards and Denysys's prices downward" and that the contracting officer's actions in adjusting the prices were a deviation from the evaluation criteria set forth in the RFQ.  *Id*. at 11-12.  Finally, MTC asserts that the contracting officer's conclusion that "a de-escalation of the price of professional services under a firm-fixed price contract is highly unusual and dubious" is unsubstantiated by the record, Pl.'s Mot. 11, and that he "clearly performed a price realism evaluation as evidenced by the downgrading of MTC's price proposal because of his conclusion that MTC's pricing was 'highly unusual and dubious.'"  *Id*. at 37.  Related to this, MTC argues that the contracting officer's assertion is irrational in light of the fact that the same contracting officer purportedly administered contracts with MTC that were awarded based on similar de-escalation of prices over the course of the contract.  *Id*.[17]  MTC also argues that because the RFQ encouraged offerors to provide discounted rates, MTC should not have been "downgraded" for providing what it characterizes as such a discount.  *Id*.

First, MTC argues that "[w]hile the Solicitation's evaluation criteria clearly stated that '[p]ricing should be based on local salary levels,' the record makes clear that the SSEB evaluated the pricing on a different basis, i.e. [sic] the SSEB determined 'whether the prices were in line with *national* standards for SAP type consultants."  Pl.'s Mot. 37 (emphasis in original).  With respect to the price proposal evaluation, the RFQ stated:

---

[16] Nor has MTC argued that the personnel substitution at issue here was necessitated by "sudden illness, death, or termination of employment," as required by the Army's Key Personnel clause.

[17] MTC alleges that Mr. Denton served as the contracting officer for USAMRAA Contract No. W81XWH-04-F-0108, a contract awarded to MTC in which it proposed similarly de-escalated prices.

The Government will evaluate Offerors' price proposals to determine price realism[18] and reasonableness.  The Government may consider excessively high or low prices as unrealistic and unreasonable, and may receive no further consideration.  The pricing information should be no more than 3 pages in length, in a spreadsheet format.  A completed project staffing plan table shall also be submitted with the price proposal.  A separate estimate is expected for each year of the overall effort.  Pricing should be based on local salary levels, thus discounts are highly encouraged.  Provide percentage of discounts to each rate.

AR 52.

At oral argument, plaintiff stated that MTC was somehow "dinged" under the Management Approach subfactor based on an improper comparison of its prices to national, rather than a local, rates.  However, the Court has not found such a comparison.  Rather, statements favorably comparing the Denysys price proposal to national rates are the only documented instance in the evaluation where national rates appear to have been used.  Specifically, in the Award Decision Memorandum, the SSA makes three statements in the price analysis section, all relating to the Denysys price proposal, which allude to national standards:

• "The SSEB felt the Denysys prices are in line with national standards for SAP Consultants and saw no issues with the prices tendered."  AR 736.
• "Denysys prices are competitive with the prices offered on their GSA MOBIS Schedule No. GS-10F-0144P and their GSA GWAC Schedule HubZone Set-Aside Contract No. GS-06T-03BND0242."  *Id.*
• "The Denysys hourly rates are also quite competitive when compared to the prices offered on the SAP Public Services, Inc's (SAP) GSA Schedule Contract No. GST0704BG1594.  SAP is the contractor from whom the Army is currently obtaining sustainment support services for TEWLS.  Denysys prices are [***] to [***] less per hour, for some labor categories similar to those on the SAP schedule."  *Id.*

While the RFQ stated that prices were to be based on local levels, and encouraged offerors to extend discounts to the Government on that basis, the RFQ did not expressly preclude the use of national standards in conducting a price reasonableness evaluation.  The weakness attributed to MTC in the price evaluation was not assessed because MTC's labor rates compared unfavorably to a national or local rate, but rather, because its overall price decreased in the option years.  *Id.*  In support of its argument that the evaluation was tainted by the use of national standards, MTC has offered no information as to how "local salary levels" may differ from "national standards," or how the application of one rather than the other would impact the evaluation of prices generally, let alone how it prejudiced MTC in this particular procurement.

_____

[18] As stated earlier, Amendment 0003 changed the provision relating to price to provide that the Army would perform a price reasonableness evaluation, in lieu of a price realism evaluation, consistent with the evaluation of firm-fixed-price offers.  AR 140.

The adjustment of the offerors' prices to which MTC objects resulted from changes to the RFQ effected by Amendment 0003, which provided as follows:

> Contract Line Items (CLINs) 0002, 0005, and 0008 required the submission of prices for travel during the base period of performance, option year one, and option year two, respectively. However, Paragraph 1.4.1 of the Performance Work Statement entitled Travel did not present travel requirements with specificity in terms of frequency, location, and duration. Therefore, the Government has inserted a figure of $75,000 for the travel CLIN for the base period and each option year (i.e., CLINs 0002, 0005, and 0008). This represents the Government's estimate of travel costs for each year for this contract. This figure will be used for proposal evaluation purposes. The post-award pricing for travel will be determined on a case-by-case scenario and on a cost reimbursement basis. Hence the Government will not consider any prices proposed by offerors for CLINs 0002, 0005, and 0008 when evaluating offerors' price proposals.

AR 140. Though the contracting officer has conceded that he used a dollar amount of $25,000 for the travel CLINs, in lieu of $75,000, this dollar figure was applied equally to both quotations, which resulted in an increased evaluated price for MTC (which had no dollars allocated for travel expenses) and a decreased evaluated price for Denysys (which had $60,000 allocated for travel expenses). In doing so, the contracting officer was following the evaluation criteria for the price proposals, as set forth in Amendment 0003. In making this limited adjustment to the travel CLINs, the contracting officer did not impermissibly adjust the firm-fixed-price portion of the quotations. Thus, MTC's argument that the award decision was based on improperly adjusted prices relating to travel costs must fail.

MTC makes much of the difference between a cost realism analysis and a cost reasonableness analysis. While it is true that the RFQ contemplated a cost reasonableness analysis, consistent with the intent to award a firm-fixed-price contract, MTC has not demonstrated that the Army improperly adjusted its price in any manner as part of an improper cost realism analysis. Notably, while the FAR precludes agencies from *adjusting* firm-fixed prices as a result of a cost realism analysis, it contemplates that such an analysis may be appropriate even in the context of firm-fixed price proposals and that the results "may be used in performance risk assessments and responsibility determinations." FAR § 15.404-1(d)(3). While the impact of the contracting officer's comments with regard to the de-escalation of MTC's prices over the option periods is unclear, it is clear that the contracting officer did not adjust MTC's proposed prices upward (or Denysys's downward) for purposes of comparing the two proposals, based on his conclusion that "a de-escalation of the price of professional services under a firm-fixed price contract is highly unusual and dubious." Rather, MTC's lower price over the potential three-year life of the contract was compared to Denysys's higher price over the life of the contract. *See* Tables 1 and 2 at pages 6-8 (Denysys's price was 1.5 percent lower than that of MTC for the base year).

Finally, even if the Army's evaluation of MTC's price proposal were improper, MTC has failed to demonstrate that it was prejudiced by the Army's actions. As noted earlier, "[t]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (quoting *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996)). To establish prejudice, plaintiff must show that there was a "substantial chance it would have received the contract award but for" the errors in the procurement process." *Id.* at 1358. Even if the Court found the adjustment to the travel CLINS to be improper, or the statement by the contracting officer regarding the de-escalation to constitute an improper "downgrade" of the MTC proposal, both the SSEB and the contracting officer understood the MTC proposal to be less costly than the Denysys proposal over the potential three-year life of the contract, and still determined that Denysys provided the best value to the Government. AR 730, 732.[19] In addition, as discussed above, the MTC proposal was evaluated as unsatisfactory under the most important factor, Personnel Qualification, and by the terms of the solicitation was therefore ineligible for award, regardless of the price evaluation.[20]

C.      **The Army Properly Evaluated Whether the Procurement Gave Rise to Actual and Potential OCIs Related to Denysys's Choice of Proposed Subcontractors, and the Army Reasonably Determined that No Such OCIs Existed.**

MTC argues that the participation of BP and CompQSoft as subcontractors to Denysys "represents a clear FAR 9.5 OCI violation" due to their "unfettered access to TEWLS proprietary system information and documentation." Pl.'s Mot. 10. OCIs occur where "because of other activities or relationships with other persons, a person is unable or potentially unable to render impartial assistance or advice to the government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage." FAR § 2.101. OCIs fall into three basic categories: "biased ground rules," "impaired objectivity," and "unequal access to information." *See Sys. Plus, Inc. v. United States*, 69 Fed. Cl. 757, 770 (2006); *see also Vantage Assocs., Inc. v. United States*, 59 Fed. Cl. 1, 10 (2003). Under the FAR, unequal access to information leads to an "unfair competitive advantage" where a contractor competing for an award possesses, for example,: "[proprietary information that was obtained from a Government official without proper authorization;" or (ii)

---

[19] The SSEB stated that "[a]lthough the cost proposal for DENYSYS shows an annual increase of 3% as opposed to MTC showing an annual decrease of 3% the SSEB feels that the total package provided by DENYSYS outweighs the difference in cost over the possible three year life of the contract." AR 730. The SSA, in his Decision Memorandum, stated that "[t]hus, the MTC proposal is $290,896.08 or 7.12% less than the Denysys proposal over the potential three-year performance period." AR 732.

[20] As noted earlier, the RFQ required that a proposal receive at least a satisfactory rating in all non-price factors and subfactors in order to be eligible for award. AR 52.

"[s]ource selection information . . . that is relevant to the contract, but is not available to all competitors" that "would assist the contractor in obtaining the contract." FAR § 9.505(b). In the context of "unequal access to information" OCI challenges, courts have examined more broadly: (1) whether an offeror had access to nonpublic information that was unavailable to the protester; (2) whether that nonpublic information was competitively useful in responding to the solicitation; (3) whether, by having unequal access to that information, the awardee was afforded an advantage that was unfair; and (4) whether not having equal access to that information prejudiced the protester. *Arinc Eng'g Servs., L.L.C. v. United States*, 77 Fed. Cl. 196, 202 (2007) (internal citations omitted).

The FAR lays out the following procedural requirements regarding OCIs:

(a) Using the general rules, procedures, and examples in this subpart, contracting officers shall analyze planned acquisitions in order to –
(1) Identify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible; and
(2) Avoid, neutralize, or mitigate significant potential conflicts before contract award.
(b) Contracting officers should obtain the advice of counsel and the assistance of appropriate technical specialists in evaluating potential conflicts and in developing any necessary solicitation provisions and contract clauses (see 9.506).
(c) Before issuing a solicitation for a contract that may involve a significant potential conflict, the contracting officer shall recommend to the head of contracting activity a course of action for resolving the conflict (see 9.506).
(d) In fulfilling their responsibilities for identifying and resolving potential conflicts, contracting officers should avoid creating unnecessary delays, burdensome information requirements, and excessive documentation. The contracting officer's judgment need be formally documented only when a substantive issue concerning potential organizational conflict of interest exists.
(e) The contracting officer shall award the contract to the apparent successful offeror unless a conflict of interest is determined to exist that cannot be avoided or mitigated.

48 C.F.R. § 9.504. "The responsibility for determining whether such unequal access exists and what steps should be taken in response thereto rests squarely with the contracting officer." *ARINC Eng'g Servs., L.L.C. v. United States*, 77 Fed. Cl. 196, 201 (2007).

Here, MTC specifically alleges that "there is an OCI inherent I [sic] the award to Denysys" because of the affiliation with its proposed subcontractors BP and CompQSoft. Pl.'s Opp. 4. MTC asserts that "Denysys's subcontractors, through their performance of other TEWLS contracts, had unequal access to information that would provide Denysys a competitive advantage in this procurement," and that the contracting officer's "conclusion that no OCI exists is wholly based on a [sic] defective certifications from Denysys that focus on other types of OCIs

21

that are not relevant here."  *Id*. at 7.[21]  MTC also argues that the contracting officer "choose [sic] to limit his inquiry, in contravention of the well established case law, to proprietary or improper or unauthorized access, and in so doing, came to the erroneously [sic] conclusion that there was no OCI."  Pl.'s Mot. 36.

The Army in response emphasizes MTC's lack of factual support for its allegation that Denysys had unequal access to competitively useful, nonpublic information.  Def.'s Mot. 20. Additionally, the Army explains that "MTC had access to a considerable amount of non-public information regarding the TEWLS system," Def.'s Response 3, and that therefore it was in actuality MTC's access to certain information, rather than that of Denysys by way of its subcontractors, that "posed the greatest threat of a conflict of interest."  *Id*. at 5.  The Army also states that "MTC offers nothing in the way of contradiction to [the contracting officer's] thorough analysis and reasoned conclusion that no OCI existed."  Def.'s Mot. 21.[22]  Further, the Army states that "the prior contracts performed by BearingPoint and CompQSoft were very distinct from the TEWLS sustainment contract.  Consequently, any information that they would have received properly and with authorization within the scope of those contracts would not represent any competitively useful information in the context of this solicitation."  Def.'s Response 18.  Finally, in response to the argument that the contracting officer's OCI investigations were improperly limited in scope, the Government asserts that because the contracting officer considered proprietary information, information that may have been received through improper or unauthorized means, and more generally information provided to the contractors through authorized access in the course of performing their duties in prior contracts, "the entire spectrum of potential information that BearingPoint and CompQSoft could have received has been exhausted."  Def.'s Response 18.

1.   The Contracting Officer Thoroughly Investigated MTC's Assertions With Respect to OCIs

The record demonstrates that the contracting officer analyzed the procurement at issue in this protest in order to identify and evaluate potential or actual OCIs, and documented both his findings and his conclusion that the participation of MTC and Denysys (including Denysys's subcontractors) did not create an impermissible OCI.  The determinations and findings made in response to the bid protests brought before the GAO are summarized in two separate documents: the OCI Determination and Findings (January 31, 2007), AR 68-138, and the OCI Determination and Findings (May 18, 2007), AR 739-91.

---

[21] Actually, the Denysys certification specifically addressed the question whether its role gave rise to an OCI based on "unequal access to information."  AR 83.

[22] The GAO, in denying MTC's third protest in that forum, stated that "as documented extensively in the agency record, the agency gave thorough and comprehensive consideration to the prior activities of Denysys and its subcontractors, as well as MTC and its subcontractors, in order to assess whether those activities created OCIs."  AR 1078-79.  The Court agrees.

In response to the first GAO bid protest, in which MTC took issue with the participation of BP as a subcontractor to Denysys, the contracting officer took the following actions: (1) he required that all contractors submit an OCI certification; (2) he solicited and received a detailed response to the MTC protest from Denysys; (3) he surveyed three Government technical experts, exploring the potential for an OCI with respect to BP due to its participation in prior contracts; and (4) he interviewed the TEWLS Program Manager and Competency Center Director/Deputy Program Manager.  AR 68.  In response to the second GAO bid protest, the contracting officer re-investigated the issue whether BP's participation constituted an OCI.  He also analyzed the participation of CompQSoft as a subcontractor to Denysys and analyzed whether MTC's participation as a prime contractor gave rise to an OCI.  The record shows that the contracting officer performed two thorough and comprehensive investigations and carefully documented his conclusion that no OCI existed.

> 2.   The Contracting Officer Properly Concluded That There Were No OCIs, Actual or Potential, in Connection With The Procurement

MTC argues that "[i]n his analysis, [the contracting officer] choose [sic] to limit his inquiry, in contravention of the well established case law, to proprietary or improper or unauthorized access, and in so doing, came to the erroneously [sic] conclusion that there was no OCI."  Pl.'s Opp. 4.  The record demonstrates that the Contracting Officer based his conclusion regarding the absence of any actual or potential OCI not on a limited inquiry whether Denysys and its subcontractors had access to proprietary or unauthorized information, but on a more comprehensive consideration of the work to be performed under the contract at issue, and the work performed by MTC, BP, and CompQSoft under prior contracts.  In doing so, the Contracting Officer considered whether any information properly obtained in performing those contracts resulted in an unfair competitive advantage.  As summarized by GAO in denying MTC's third protest:

> Specifically, the contracting officer performed an analysis of the work that would be required under the solicitation at issue – that is, operational sustainment of the TEWLS system.  The contracting officer then turned to documenting an extensive review regarding the activities previously performed by Denysys and its subcontractors, under prior contracts.  In that regard, the contracting officer noted that the TEWLS system is comprised of software owned by SAP AG and that, in performing prior contracts, neither Denysys nor its proposed subcontractors have been materially involved in development or customizing the TEWLS system, have not had a role in developing the requirements for the solicitation at issue; that neither Denysys nor its subcontractors have had access to any underlying software code configuration for TEWLS; that neither Denysys nor its subcontractors provided technical direction for TEWLS; and that neither Denysys or its subcontractors have been involved in any discussions where contract sensitive information has been discussed.

AR 1079-80 (internal citations omitted).  Following are some specific examples from the record which demonstrate that the investigation was not limited in the manner suggested by MTC:

- The contracting officer determined that BP's work under a separate contract constituted "a discrete portion of the overall TEWLS program" and that "[t]his work does not provide [BP] with access to nonpublic information that would provide it with an unfair advantage in competing for the sustainment contract."  AR 74.
- In addition to asking whether the existing BP contract gave it access to any proprietary information that would be relevant to the TEWLS contract at issue in this protest, the survey issued to BP asked more broadly whether there were any similarities or overlapping work requirements.  AR 76.[23]
- In conducting his re-investigation pursuant to the second GAO protest, the contracting officer found that "MTC did have access to information, proprietary *and otherwise*, during their work on the USAMMA URL contract from January 2004 to January 2006.  However, this access to information was authorized by their contract.  Denysys, the other prime contractor competing on this procurement did not have direct access to any information.  However, its two subcontractors, BP and CompQSoft, apparently had access to some information through contract work they performed for JMLFDC and SAP Public Services Sector, Inc., respectively.  However, once again, I found no evidence that these contractors had unauthorized access to proprietary information *or any other information* that would give them a competitive advantage over another offeror.  AR 744 (emphasis added).

In sum, MTC's allegations that the contracting officer's determination was erroneously based on an improperly restricted scope of his investigation is unsupported by the record.

MTC's concern with respect to past TEWLS-related contracts appears to be focused on "systems engineering."  Plaintiff's Response to the Defendant's Motion to Supplement the Record (docket entry 32) ("Essentially, BP was writing specifications for TEWLS and then they were allowed to bid on the work arising from those specifications.  BP had intimate knowledge and influence into the TEWLS Sustainment system and end-user problems.")  The contracting officer, in his Determinations and Findings, defined "systems engineering" as: "determining specifications, identifying and resolving interface problems, developing test requirements, evaluating test data, and supervision design."  AR 741.  The contracting officer, after an in-depth

---

[23] The parties disagree with respect to the characterization of the work performed by BP and CompQSoft under prior contracts.  *See, e.g.*, Pl's Opp. 6 (discussing whether BP performed sustainment and maintenance work or development work); *see also* Contracting Officer's Determinations and Findings, May 18, 2007, AR 740 (discussing the difference between functional sustainment and technical sustainment).  The Court does not find the issue determinative.  The Army properly considered whether the work under prior contracts resulted in Denysys's gaining access through its sub-contractors to information that provided an unfair competitive advantage to Denysys in the procurement at issue.

technical review of the various contracts, stated that "[m]y investigation revealed that none of the contractors involved, especially BP, have provided systems engineering to any significant degree that would cause an OCI."  *Id.*  Therefore, the specific concerns identified by MTC were in fact thoroughly considered by the contracting officer.

The contracting officer's determination that neither Denysys nor MTC had a level or type of involvement with the TEWLS program sufficient to give rise to an OCI based on unequal access to information was supported by the technical information obtained by the contracting officer during the course of his investigations.  For example, the contracting officer summarized the TEWLS Program Manager's explanation of BP's role under its two prior contracts related to the TEWLS program as follows:

> Under these two contracts, BearingPoint was tasked to provide TEWLS management support.  This equates to what is known as functional support.  That is, BearingPoint assisted the Army subject matter experts (SMEs) to test and to evaluate Action Items created as a result of a "bug" determination by Government users in the TEWLS operational environment. [The TEWLS PM] further explains that "Bearing Point also assisted in writing TEWLS test scripts, executing those test scripts, and then providing written results back to the Government SMEs for validation and acceptance."  Most important of all is that [the TEWLS PM] states that "BearingPoint personnel did not perform technical sustainment tasks, nor did it create requirements for TEWLS applications."  In addition, [the TEWLS PM] goes on to say that "the Bearing Point personnel do not direct SAP personnel or tell SAP how to configure TEWLS.  BP has no control over the design of TEWLS."

AR 742.  The contracting officer similarly examined CompQSoft's role related to TEWLS in detail, concluding:

> I did not find that CompQSoft had access to any information, proprietary or otherwise, from their subcontract work with Bearing Point and SAP Public Services. Inc.  CompQSoft worked as a subcontractor to Bearing Point in supporting the Joint Medical Logistics Functional Development Center (JMLFDC) TEWLS work in a non-sustainment capacity.  CompQSoft also supported TEWLS in their work as a subcontractor to a subcontractor to SAP Public Sector Services, Inc. which is also not sustainment work.  CompQSoft provided a letter furnished to Denysys for their OCI certification, which documents their competitive analysis of the potential new work against all current and previous work performed in support of TEWLS sustainment.  CompQSoft closes by stating that "No real or perceived OCI, as defined in FAR 2.101 and discussed in Far 9.5, will result from an award of the proposed work."  I could not find any evidence that an OCI existed and find no reason to question CompQSoft's declaration.  I also inquired of Denysys how much assistance was

obtained from CompQSoft during preparation of their quote.  Mr. Denny,
President of Denysys, responded that CompQSoft did not provide any information
and only provided two qualified personnel candidates . . . .

AR 744.  Finally, with respect to MTC, the TEWLS PM stated that "if OCI is defined as access
to TEWLS-related information, MTC has had more access to that sort of information than
BearingPoint based upon its work under the prior USAMMA URL sustainment contract."  AR
742.  While the contracting officer observed that MTC, BP and CompQSoft all received some
information related to TEWLS in the performance of their prior contracts, he concluded "[t]his
type of general access to the same software systems and personnel is inherent whenever a
contractor is working at a Government facility, whether as an incumbent for a specific
requirement or working on related projects.  Mere access to the software and government
personnel does not give rise to an OCI."  AR 74 (Contracting Officer's Determinations and
Findings, Jan. 31, 2007).

The contracting officer undertook a detailed analysis of the work performed by MTC, BP
and CompQSoft pursuant to prior contracts and reached the conclusion that their work in
performing those contracts did not provide either MTC or Denysys with unequal access to
information that would provide a competitive advantage with respect to the procurement at issue.
AR 744.  MTC, on the other hand, makes broad, vague assertions that prior contracts related to
the TEWLS program gave the subcontractors access to information relating to the Government's
"plans and requirements" with respect to TEWLS.  Pl.'s Mot. 36.[24]  MTC has not specified what
relevant non-public information, if any, Denysys gained as a result of its relationship with BP and
CompQSoft.  Furthermore, MTC has not demonstrated how such non-public information,
assuming it was obtained, provided Denysys with an unfair competitive advantage in the

---

[24] MTC argues that the so-called "November 2005 Exclusion Report" (Pl. Mot. Exhibit 1,
docket entry 19-2), "clearly states that an OCI exists where companies like BPI and CompQSoft
have access to the information relating to the Government's plans and requirements." Pl.'s Opp.
4.  The Court does not derive such a conclusion from this document.  Rather, the November 2005
Exclusion Report, while acknowledging that work by contractors related to the TEWLS program
could present a conflict of interest, stated that for this very reason caution was taken with respect
to access to information.  *Id*. at 5 ("it is true that the TEWLS Program Office was concerned
about conflicts of interest and tried to ensure that contractors worked within the scope of their
contracts and were not intentionally or mistakenly provided information which would give them
an advantage in any future competitive procurements").

procurement at issue.[25]  Thus, the Court finds that MTC has failed to meet its burden of proof with respect to its OCI allegations.

### CONCLUSION

For the reasons stated above, the Court concludes as follows.  The Army properly evaluated MTC's technical proposal pursuant to the evaluation criteria set forth in the RFQ, and the Army acted properly in declining to evaluate and accept MTC's late proposal modification seeking to substitute personnel.  The Army properly evaluated MTC's price proposal.  Finally, the contracting officer thoroughly and objectively investigated MTC's assertions with respect to OCIs, and reasonably concluded that no actual or potential OCIs existed.

Accordingly, the Court **ORDERS** that MTC's motion for judgment on the administrative record (docket entry 19) is **DENIED** and that defendant's motion for judgment on the administrative record (docket entry 16) is **GRANTED**.  Because this order resolves the case on the merits in favor of defendant, no preliminary or permanent injunctive relief is necessary or warranted.  Therefore, the Court **FURTHER ORDERS** that MTC's motion for preliminary injunction (docket entry 4) is **DENIED**.  The Clerk is directed to enter judgment in favor of defendant.

The parties have designated certain information subject to the protective order (docket entry 10) entered in this action on October 11, 2007.  The Court therefore shall initially file this Opinion and Order under seal.  The parties shall review the Opinion and Order to determine whether, in their view, any information contained herein should be redacted prior to publication in accordance with the terms of the protective order.  The parties shall file, within 14 days of the filing of this Opinion and Order, a joint status report indicating what information, if any, they contend should be redacted.  The parties shall also in their joint status report explain with specificity the reasons they contend the information in question should be redacted.

IT IS SO ORDERED.


  s/ George W. Miller
GEORGE W. MILLER
Judge

---

[25] At oral argument, MTC argued that the alleged unequal access to information would have allowed Denysys to "better identify the personnel and staffing levels and the type of people that the government would be interested in . . . working on the TEWLS sustainment."  Tr. 61. However, the Army's rejection of MTC's proposed personnel did not involve issues concerning the "skill mix and quantity" of the proposed employees.  Rather, it was MTC's non-compliance with the RFQ's security and availability requirements  that disqualified MTC's proposal from consideration.  *See* Def.'s Response 23.